156 F.3d 384
 58 Soc.Sec.Rep.Ser. 364
 Monica FURLONG, Lawrence Schwartz, Robert Sloan and Kenneth
Y. Sunew, individually and on behalf of all others
similarly situated, Plaintiffs-Appellants,
v.
Donna E. SHALALA, in her capacity as Secretary of the
Department of Health & Human Services; Bruce C. Vladeck, in
his capacity as Administrator of the Health Care Financing
Administration, Defendants-Appellees.
 Docket No. 97-6220.
 United States Court of Appeals,
Second Circuit.
 Argued March 16, 1998.
Decided Sept. 23, 1998.
 
 Peter J. Clines, New York City (Whitney North Seymour, Jr., Craig A. Landy, Landy & Seymour, New York City), for Plaintiffs-Appellants.
 Neil M. Corwin, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney, Steven M. Haber, Assistant United States Attorney, Southern District of New York, New York City), for Defendants-Appellees.
 Before: CARDAMONE, JACOBS, Circuit Judges, and SWEET,* District Judge
 CARDAMONE, Circuit Judge:
 
 
 1
 Plaintiffs are four anesthesiologists who work in New York City hospitals. Two of them appeal from an order of the United States District Court for the Southern District of New York, entered before Judge Loretta J. Preska on July 8, 1997, which granted summary judgment in favor of defendants, dismissing their causes of action. Defendants are Donna E. Shalala, Secretary of the Department of Health and Human Services (Secretary) and Bruce C. Vladeck, Administrator of the Health Care Financing Administration (Health Financing Agency).
 
 
 2
 Plaintiffs' suit in part concerns the validity of a particular Department of Health and Human Services (Department) regulation that distinguishes between "assignee" and "non-assigned" physicians with respect to the right to appeal adverse payment determinations. Plaintiffs allege in their complaint that the regulation promulgated by the Secretary is arbitrary and capricious and deprives them of the equal protection of the law. The other part of plaintiffs' suit involves the application of a rule, the result of which is to reduce the amount they can charge for a certain type of procedure. Without any mechanism for appeal, the reduction, they assert deprived them of a property interest without due process of law.
 
 BACKGROUND
 
 3
 To plunge immediately without any explanation into the complexities of social security law is like jumping into a murky muddle of a regulatory no-man's land. So before proceeding further, it is helpful to set out the pertinent statutory and regulatory framework upon which this case will be decided.A. Statutory and Regulatory Background
 
 1. Part B of Medicare
 
 4
 Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq. (Medicare statute or Act), establishes the Medicare program providing medical insurance for persons age 65 or older and those under age 65 who are disabled. The Medicare program consists of two parts: Part A and Part B. Part A, funded by Social Security taxes, provides major medical insurance coverage for the costs of hospital care, related post-hospital services, home health services, and hospice care. See generally 42 U.S.C. §§ 1395c-1395i-4. Part B, at issue in this appeal, is a federally subsidized, voluntary health insurance program. It provides supplemental insurance coverage for medical and other services excluded from Part A. See id. §§ 1395j-1395w-4. Eligible persons who elect to enroll in the Part B program pay monthly premiums. These premiums, combined with contributions from the federal government, are deposited into the Federal Supplementary Medical Insurance Trust Fund (Trust Fund) to finance Part B coverage. See id. § 1395j (1994); see generally id. § 1395t (1994).
 
 
 5
 Although the defendant Secretary is ultimately responsible for administering the Part B program, § 1395u of the Medicare statute authorizes her to contract with private insurance carriers to manage Part B claims and the disbursement process on a day-to-day basis. Thus, after Part B patients receive medical care, their treating physicians submit insurance claims on their behalf to these carriers for processing and payment. The carriers then evaluate the claims to determine whether and to what extent they are reimbursable. See id. § 1395u(a)(1)(A) (1994). For services rendered before January 1, 1992, the carriers' calculation of the Medicare-approved charge for a reimbursable claim had to be "reasonable," based on the prevailing charge for comparable services in the particular community. See id.; see generally 42 C.F.R. § 405.501 et seq. (1997). The Department subsequently promulgated a statutory fee schedule of Medicare-approved charges to replace this discretionary standard and ensure nationally uniform relative values for all physicians' services rendered on or after January 1, 1992.[1] See generally 42 U.S.C. § 1395w-4(a)(1) (1994); 42 C.F.R. §§ 414.1 et seq. (1997). Once a carrier determines the Medicare-approved charge, it pays 80 percent of that charge out of the Trust Fund. See 42 U.S.C. § 1395l(a)(1) (1994), as amended by, Act of Aug. 5, 1997, 42 U.S.C.A. § 1395l(a)(1) (West Supp.1998); id. § 1395u(a)(1)(B) (1994).
 
 2. Reimbursement to Physicians
 
 6
 Reimbursement to physicians for their charges incurred under Part B occurs in one of two ways. First, the treating physician may elect to accept assignment of his patient's right to reimbursement and become an "assignee-physician." Physicians also have the option of becoming "participating physicians," that is, physicians who agree to accept an assignment for all Part B services they provide throughout the year. See id. § 1395u(b)(3)(B)(ii) & (h)(1) (1994). Under this scenario, the assignee-physician must agree to accept the Medicare-approved charge in full satisfaction of his services. See id. § 1395u(b)(3)(B)(ii). The carrier pays 80 percent of that charge directly from the Trust Fund to the assignee-physician; the remaining 20 percent of the approved charge is the patient's responsibility. See id. § 1395l(a)(1) (West Supp.1998).
 
 
 7
 Alternatively, the treating physician may decline assignment and become a "non-assigned physician." In this second scenario, the non-assigned physician bills the patient--who is the responsible party--directly for the Medicare-approved charge, and the carrier reimburses the patient for 80 percent of the Medicare-approved charge from the Trust Fund. See id. §§ 1395l(a)(1) & 1395u(b)(3)(B)(i) (1994). The non-assigned physician may tack an additional amount, to be determined by the physician, on top of the Medicare-approved charge. This additional amount, however, is capped by a "limiting charge," above which a non-assigned physician may not bill without being subject to sanctions. See id. § 1395w-4(g) (1994). The limiting charge is determined as a fixed percentage of the Medicare-approved charge. For example, the limiting charge for services rendered after December 31, 1992 is 115 percent of the applicable Medicare-approved charge. See id. § 1395w-4(g)(2)(C). In this manner, even though non-assigned physicians may bill their patients for more than the Medicare-approved charge, that charge nevertheless directly dictates what amount may be billed.
 
 3. Review Process on Reimbursement Claims
 
 8
 A physician's decision to decline assignment dramatically affects his ability to appeal a carrier's determination of the Medicare-approved amount of the doctor's charges. As a preliminary matter, the Medicare statute itself affords a Part B enrollee access to administrative and judicial review of the carrier's decision, depending on the amount in controversy. See Abbey v. Sullivan, 978 F.2d 37, 40 (2d Cir.1992). This procedural protection occurs at four different adjudicatory levels. Following the carrier's initial de novo determination, § 1395u(b)(3)(C) of the Act entitles the patient to a "fair hearing," if the amount in controversy is at least $100, to be conducted by a carrier-designated hearing officer. See generally 42 C.F.R. § 405.807-405.815. If that hearing results in a decision adverse to the patient, and the amount in controversy equals or exceeds $500, the patient may request an evidentiary hearing and de novo review of the carrier's decision by an Administrative Law Judge (ALJ). See 42 U.S.C. § 1395ff(b)(1)(C) (incorporating procedures for administrative review set forth at 42 U.S.C. § 405(b) & (b)(2)(B) (1994)). If that too is unsuccessful, the patient may appeal the ALJ's decision to an appeals council. See id. Upon issuance of the appeals council's ruling, which is the final administrative decision, a dissatisfied patient may within 60 days seek judicial review of the Secretary's determination in the district court, but only if the amount in controversy equals or exceeds $1,000. See id. (incorporating procedures for judicial review set forth at 42 U.S.C. § 405(g)).
 
 
 9
 In implementing the Medicare statute, the Health Financing Agency on behalf of the Department adopted a regulation extending the same appeals rights that patients have to assignee-physicians, that is, those physicians that furnish services to Part B patients and accept assignment from the patients. See 42 C.F.R. § 405.801(b)(1) (1997). But the regulation did not extend the right to appeal a carrier's initial Medicare-approved charge determination to non-assigned physicians.
 
 
 10
 4. Modification of Medicare-Approved Charges
 
 
 11
 The statutory fee schedule establishing fees for particular services is subject to payment modifications made by the Department. The Health Financing Agency, the Agency within the Department that administers Medicare, issues a Medicare Carrier Manual (Medicare Manual) that contains policies, procedures and instructions to govern carriers in their administration of the Medicare program, including rules governing payment for various procedures. Carriers must comply with these policy statements when they decide claims. See 42 U.S.C. § 1395u(b)(5) (1994); 42 C.F.R. § 405.502(d).
 
 
 12
 In particular, Medicare Manual § 4149 modifies Medicare-approved charges for multiple surgical procedures. It instructs carriers to
 
 
 13
 [e]stablish guidelines for use in coding charges for surgery when more than one surgical procedure is performed during the same operation, through the same opening, through a different opening or by different surgical procedures. The guidelines should establish the allowable amount based upon (1) the major procedure only, or (2) the major procedure plus partial amounts for other procedures.
 
 
 14
 When determining the total Medicare-approved charge for multiple surgical procedures, some carriers elected the second option under Medicare Manual § 4149. In so doing, they reimbursed patients or their assignee-physician based on: (1) the full charge contained in the statutory fee schedule for the most expensive procedure performed; (2) one half of the statutory fee for the next most expensive procedure; and (3) one quarter of the statutory fee for the third through fifth highest valued procedures. The Health Financing Agency subsequently adopted this "one-and-one-half" rule for all multiple surgical procedures. See 56 Fed.Reg. 59,502, 59,515 (Nov. 25, 1991) (Health Financing Agency regulation).
 
 
 15
 5. Application of the "One-and-One-Half" Rule
 
 
 16
 During heart surgery and other major surgery, anesthesiologists commonly perform concurrent invasive monitoring on patients with a history of cardiac disease to detect potential emergency conditions. The procedure provides constant monitoring of a patient's blood pressure, blood gases, blood flow, heart performance and other vital signs during the course of surgery. It involves the performance of two individual procedures on the same patient during the same surgery. The two procedures consist of a percutaneous arterial line procedure (A-line procedure) by which a narrow plastic tube is inserted into a patient's artery, together with either a Swan-Ganz procedure by which a catheter is inserted through the chambers of the right side of the heart, or a central venous procedure by which a plastic tube is inserted into a vein and passed retrograde into a large central venous (vein) channel.
 
 
 17
 When carriers determined the appropriate Medicare-approved charge for this service, they reasoned that because anesthesiologists performed concurrent invasive monitoring during surgery, it was "surgical" and therefore subject to the "one-and-one-half" rule. The carriers accordingly reduced the total Medicare-approved charge for the service to below the full amount promulgated by the statutory fee schedule. This action by the carriers impacted the amount plaintiffs received for these services rendered through 1993, for which they brought this suit. Since January 1, 1994 the Health Financing Agency has mandated that the "one-and-one-half" rule no longer be applied to concurrent invasive monitoring.
 
 B. The Present Appeal
 
 18
 Monica Furlong, Lawrence Schwartz, Robert Sloan and Kenneth Y. Sunew are the plaintiffs who commenced the present action on June 30, 1994 in federal court. At various times in 1992 and 1993 they performed concurrent invasive monitoring on patients undergoing surgery at various New York hospitals. Furlong and Schwartz accepted assignment for their services. Sloan accepted assignment for some, but not all, services. Sunew did not accept assignment for his services.
 
 
 19
 Plaintiffs' complaint, which seeks declaratory and injunctive relief, is divided into two parts. The first part seeks relief on behalf of a putative class of anesthesiologists who had accepted assignment of Part B claims from their patients for concurrent invasive monitoring procedures from July 1, 1988 to December 31, 1993. In particular, Furlong, Schwartz and Sloan allege that the carriers improperly applied the "one-and-one-half" rule to concurrent invasive monitoring because the procedure should have been considered "medical," not "surgical." As a result of applying the rule, Furlong, Schwartz and Sloan continue, the carriers erroneously lowered the Medicare-approved charge for their services and reduced the reimbursement amount to which they were entitled, thereby violating § 706(2)(A) of the Administrative Procedure Act (APA) and the Fifth Amendment Due Process clause.
 
 
 20
 The second part of the complaint involves a putative class of physicians, like Sloan and Sunew, who exercised their option to refuse assignment of their patients' Medicare claims for concurrent invasive monitoring procedures performed on or after January 1, 1991. Sloan and Sunew allege they were in a unique predicament because the carriers' determinations of the Medicare-approved charge directly impacted their ability to bill patients by limiting charges for their services. Yet because the physicians had no right under the regulations to appeal, they had no recourse to rectify the allegedly improper fixing of that charge. They asserted further that their patients had no incentive to exercise their appeals rights to challenge these determinations since a successful appeal would result in greater financial liability for the patient. Specifically, Sloan and Sunew asserted that the Department violated the APA and their Fifth Amendment Equal Protection and Due Process rights.
 
 
 21
 Defendants moved to dismiss the complaint in its entirety in January 1995. Judge Preska in a July 1996 order granted the motion, insofar as it concerned the anesthesiologists who had accepted assignment, on the ground that they had failed to exhaust administrative remedies. Both sides subsequently moved for summary judgment on the remaining claims regarding the anesthesiologists who had declined assignment. Defendants' motion was granted in an order entered on July 8, 1997.[2]
 
 
 22
 Appellants Sloan and Sunew challenge the July 8, 1997 dismissal of their claims on the basis that granting appeals rights to assignee-physicians but not non-assigned physicians is arbitrary and capricious in violation of § 706(2)(A) of the APA, and denies them equal protection of the laws. Appellants further maintain that non-assigned physicians have a property interest in full payment for their services, and that defendants' application of the "one-and-one-half" rule without permitting any administrative or judicial appeal deprives them of that interest without due process of the law. We analyze these three issues in order.
 
 DISCUSSION
 
 23
 I Is the Distinction Between Physicians Arbitrary and Capricious?
 
 
 24
 The Medicare statute grants patients enrolled in Part B the right to challenge a carrier's calculation of the Medicare-approved charge for services provided to the patient. This review, outlined earlier, starts with a carrier fair hearing and under certain circumstances may be pursued into federal court. In implementing the Act, the Secretary chose to extend patients' appeals rights only to assignee-physicians. See 42 C.F.R. § 405.801(b)(1). Sloan and Sunew characterize this particular distinction between assignee--and non-assigned physicians as arbitrary and capricious. They urge we apply the APA, which instructs a court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994).
 
 
 25
 The district court rejected this argument and ruled instead that the Department's regulation comports with the plain meaning of the Medicare statute. Our review of the Secretary's interpretation of the Medicare statute is governed by Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). There, the Supreme Court held that when a court reviews an agency's construction of a statute, it must first decide whether Congress has directly spoken to the precise question at issue. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. 2778. The trial court, in examining the language of the Medicare statute, concluded that the statute unambiguously conferred appeals rights upon assignee-physicians, but not upon non-assigned physicians.
 
 
 26
 We focus our discussion on the language Congress used. Congress expressly created the appeals rights at issue for "individual[s]" enrolled in the Part B program. See 42 U.S.C. § 1395u(b)(3)(C) (1994) ("[Carriers] will establish and maintain procedures pursuant to which an individual enrolled under this part will be granted an opportunity for a fair hearing by the carrier ...." (emphasis added)); id. § 1395ff(b)(1)(C) ("Any individual dissatisfied with any determination [of the amount of benefits under Part B] shall be entitled to a hearing thereon by the Secretary to the same extent as is provided in [42 U.S.C. § 405(b) ] and to judicial review of the Secretary's final decision after such hearing as is provided in [42 U.S.C. § 405(g) ]." (emphasis added)). The question then becomes whether Congress clearly spoke to what other meaning may be assigned to the term "individual" as it is used in the statute.
 
 
 27
 The district court found the term "individual" unequivocally referred to both patients and assignee-physicians. Initially, it reasoned that "individual," as used by the statutory sections in question, certainly includes Part B patients receiving treatment. But the trial court did not stop there, extending its analysis to a review of the plain meaning of the entire Medicare statute. The court was certainly justified in doing so. See King v. St. Vincent's Hosp., 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) ("[A] statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context."); see also Yerdon v. Henry, 91 F.3d 370, 376 (2d Cir.1996) (finding the language of a statute to be unambiguous in the context of the entire statute).
 
 
 28
 The district court observed that the statute permits patients to assign their rights of payment to physicians. See 42 U.S.C. § 1395u(b)(3)(B)(ii) & (h)(1). When a physician accepts assignment, the district court continued, the physician effectively steps into the shoes of the patient and assumes the patient's rights, including the right to appeal a carrier's claim determination. Thus, the term "individual," the court concluded, must refer to whoever possesses the right to receive a Part B payment, including both patients and assignee-physicians--but excluding non-assigned physicians.
 
 
 29
 Unlike the district court, we do not believe the language of the Medicare statute is dispositive on the issue of Congress' intent. The Act does not compel any given construction of the term "individual" that would extend appeals rights only to physicians who accept assignment. The statutory language neither defines "individual" to include assignee-physicians, nor provides appeals rights to assignee-physicians. In discussing assignments, the statute simply permits a patient to assign his right to payment. It is silent as to appeals rights. See 42 U.S.C. § 1395u(b)(3)(B)(ii) & (h)(1). Further, the legislative history of the Medicare statute demonstrates no clear Congressional aim to provide appeals rights only to assignee-physicians. See Chevron, 467 U.S. at 862-64, 104 S.Ct. 2778 (analyzing legislative history to determine Congress' intent).
 
 
 30
 Yet, despite the foregoing observations, we think the regulation in question (42 C.F.R. § 405.801(b)(1)) comports with the APA. Chevron teaches that when Congress has not directly addressed the precise question at issue, we must proceed to a second-step, which incorporates a deferential review of agency action. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. 2778. If a regulation is a permissible construction, courts must defer to the view of the agency charged with administering the statute. See Allegheny Elec. Coop., Inc. v. FERC, 922 F.2d 73, 80 (2d Cir.1990) (explaining that where statutory language is ambiguous, "a reviewing court must defer to a reasonable administrative interpretation").
 
 
 31
 Appellants concede that the term "individual" includes Part B patients. Through §§ 1395u(b)(3)(C) and 1395ff(b)(1)(C), the Medicare statute confers appeals rights on Part B patients to ensure that the Medicare program reimburses their claims at the proper rate. Congress also enabled those individuals to assign their rights to payment from the Medicare program to their physicians. See 42 U.S.C. § 1395u(b)(3)(B)(ii) & (h)(1). The Secretary's construction in 42 C.F.R. § 405.801(b)(1) reasonably integrates these provisions regarding appeals and assignment. See NationsBank of N.C. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) ("If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment 'controlling weight.' ").
 
 
 32
 By granting appeals rights to assignee-physicians, the regulation makes a patient's right to Part B payment more alienable thereby encouraging physicians to accept assignments and allowing patients to avoid additional charges and administrative responsibilities. Additionally, because an assignment transfers to the physician the patient's right to payment, it is reasonable that, upon assignment, the physician is also accorded the patient's statutory appeals rights. Under common law, an assignee steps into the assignor's shoes and acquires whatever rights the latter had. See, e.g., Cargill, Inc. v. Boag Cold Storage Warehouse, Inc., 71 F.3d 545, 552 (6th Cir.1995) ("Once it took assignments from the bailors, [plaintiff] would have had a right to step into their shoes and sue as an assignee...."). Conversely, it is reasonable that the challenged regulation does not extend the patient's appeals rights to non-assigned physicians, because such physicians do not possess any right to payment from the Medicare program on the patient's Part B claims.
 
 
 33
 After applying Chevron to determine that the Secretary's decision to extend appeals rights to assignee-physicians, but not to non-assigned physicians, is a permissible interpretation of the Medicare statute, we defer to the Secretary and hold that 42 C.F.R. § 405.801(b)(1), the regulation in question, does not violate the APA.
 
 II Equal Protection Claim
 
 34
 Appellants next assert that by distinguishing between assignee-physicians and non-assigned physicians in the context of the availability of appeals rights, 42 C.F.R. § 405.801(b) violates the Equal Protection component of the Fifth Amendment. See, e.g., Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (recognizing an implicit equal protection component within the Fifth Amendment). The district court properly dismissed this constitutional claim. Because Sloan and Sunew concede the difference in appeals rights does not infringe upon a fundamental right or implicate a suspect classification, the distinction need be only rationally related to a legitimate government interest. See City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam).
 
 
 35
 The underlying purpose of the Medicare statute is to provide affordable medical insurance for the aged and disabled, see Garelick v. Sullivan, 987 F.2d 913, 914 (2d Cir.1993), clearly a legitimate purpose. Sloan and Sunew insist that the distinction between assignee-physicians and non-assigned physicians has no rational relation to this purpose. Quite the contrary. The Medicare statute provides appeals rights to Part B patients to ensure that correct decisions are made regarding their eligibility and the amount of payment to which they are entitled. Because the statute permits these patients to assign their rights to payment, see 42 U.S.C. § 1395u(b)(3)(B)(ii) & (h)(1), it is reasonable to extend these same appeals rights to assignee-physicians.
 
 
 36
 Appellants declare that if appeals rights are extended to assignee-physicians, no rational basis exists for denying those same appeals rights to non-assigned physicians. This point ignores the practical effect of a physician's decision to refuse assignment. While the Medicare statute limits the amount assignee-physicians may charge their patients to the Medicare-approved charge, non-assigned physicians are permitted to charge their patients in excess of the Medicare-approved charge, a practice called "balance billing." See Garelick, 987 F.2d at 915; see also Multnomah County Med. Soc'y v. Scott, 825 F.2d 1410, 1414 (9th Cir.1987).
 
 
 37
 As a result, non-assigned physicians may charge more for the same services than assignee-physicians. By granting assignee-physicians greater appeals rights, the regulation encourages physicians to accept assignment, thereby reducing the cost of delivering health care to Part B patients. See Garelick, 987 F.2d at 915 ("Congress has enacted a series of statutes [such as 42 U.S.C. § 1395u(h)(1) ] designed to discourage and limit balance billing and encourage physicians to accept assignment."). Consequently, the regulation that distinguishes between assignee-physicians and non-assigned physicians is rationally related to a legitimate purpose.
 
 III The Due Process Claim
 
 38
 As their final claim, Sloan and Sunew insist that the Secretary's decision to deny appeals rights to non-assigned physicians violates the Due Process Clause of the Fifth Amendment. Specifically, they observe that when carriers determine the Medicare-approved charge, these decisions directly affect the maximum fee that non-assigned physicians may bill Part B patients because the limiting charge is a fixed percentage of the Medicare-approved charge. As such, Sloan and Sunew claim a protected property interest in having the Medicare-approved charge for their services be based upon a rate equal to the amount promulgated in the statutory fee schedule, without being subject to reduction by operation of the "one-and-one-half" rule. Appellants declare that the carriers' application of the rule to concurrent invasive monitoring services deprived them of this interest without due process of law, since they have no recourse under the Act and its implementing regulations to appeal the allegedly improper determinations.
 
 
 39
 To establish entitlement to due process protection under the Fifth Amendment, Sloan and Sunew must first demonstrate they possess a property interest of constitutional dimension. See Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 628-29 (2d Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997). A cognizable property interest is more than just a "unilateral expectation"; it is a "legitimate claim of entitlement." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Although the Constitution protects property interests, it does not create them. "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id.
 
 
 40
 We have previously held that professionals who provide services under a federal program such as Medicaid or Medicare have a property interest in reimbursement for their services at the "duly promulgated reimbursement rate." See Oberlander v. Perales, 740 F.2d 116, 120 (2d Cir.1984) (holding Medicaid providers have a "property interest in money paid for services already performed in reliance on a duly promulgated reimbursement rate"); see also White Plains Nursing Home v. Whalen, 53 A.D.2d 926, 385 N.Y.S.2d 392, 394 (3d Dep't 1976) ("The petitioner undertook to perform its nursing services in reliance upon the said rate and has received the money. Under such circumstances, we must conclude that petitioner has a property right in the alleged overpayments."), aff'd, 42 N.Y.2d 838, 397 N.Y.S.2d 378, 366 N.E.2d 79 (1977).
 
 
 41
 The fee schedule provides the Medicare-approved rates for services and thus would typically constitute the duly promulgated reimbursement rate. However, as noted, the fee schedule is subject to modification through policy statements, and the carriers from which plaintiffs sought reimbursement for the invasive monitoring procedure applied the Medicare Manual's "one-and-one-half" rule to reduce plaintiffs' reimbursement below the fee schedule rate. Appellants point to three possible sources for their alleged property interest in being reimbursed at the fee schedule rate as opposed to the lower rate applied by the carriers: (1) the Medicare Manual and accompanying Health Financing Agency regulation; (2) the APA; and (3) prior ALJ decisions. The district court rejected each basis and held that the physicians had no property interest at stake to be exempt from the "one-and-one-half" rule. We analyze each possible source of a property interest to determine whether Sloan and Sunew had a legitimate basis to demand that the rule not be applied to their services.
 
 
 42
 A. The Medicare Manual and Accompanying Agency Regulation
 
 
 43
 Sloan and Sunew argue that their property interest arises from the plain language of Medicare Manual § 4149 and the corresponding Health Financing Agency regulation. See St. Mary's Hosp. v. Blue Cross & Blue Shield Ass'n, 788 F.2d 888, 890 (2d Cir.1986) (recognizing that weight is to be given the Medicare Manual as an interpretive guide to Medicare regulations). Appellants urge that these origins of the "one-and-one-half" rule require, by their express language, that the rule apply only to multiple "surgical" procedures. See Medical Manual § 4149 ("Establish guidelines for use in coding charges for surgery when more than one surgical procedure is performed during the same operation, through the same opening, through a different opening or by different surgical procedures." (emphasis added)); 56 Fed.Reg. 59,502, 59,515 (Nov. 25, 1991) (explaining under the heading "Multiple surgery " that in general, "[i]f a surgeon performs more than one procedure on the same patient on the same day," the "one-and-one-half" rule applies (emphasis added)). Neither provision explicitly refers to "concurrent invasive monitoring."
 
 
 44
 Further, appellants proffered evidence from the medical community, including three cardiologists, defining invasive monitoring as a "medical," rather than "surgical," procedure. As a result, appellants tell us the rule literally does not apply to them, and therefore they were entitled to bill patients for the procedure based upon the duly promulgated and unmodified statutory fee.
 
 
 45
 We agree with the district court that the Medicare Manual and Health Financing Agency regulation do not confer a property interest. Neither of these sources--nor for that matter any publication, regulation or fee schedule--affirmatively mandated application of the "one-and-one-half" rule to concurrent invasive monitoring by requiring carriers to treat the service as "surgical." At the same time, we find no authority proclaiming the service to be "medical" so as to escape the rule.
 
 
 46
 The focus of our entitlement analysis here shifts to the degree of carrier discretion in applying the "one-and-one-half" rule. We have held that when a benefit is denied, and that action results from an exercise of official discretion, entitlement to the benefit occurs only when official discretion is so narrowly confined as virtually to guarantee conferral of the benefit. See Bernheim v. Litt, 79 F.3d 318, 323 (2d Cir.1996); see also Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 463, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); Gagliardi v. Village of Pawling, 18 F.3d 188, 192 (2d Cir.1994); Yale Auto Parts, Inc. v. Johnson, 758 F.2d 54, 59 (2d Cir.1985). Such is not the case here. Because carriers were free to interpret the service as "surgical," if they so chose, and apply the rule as they saw fit, their discretion was broad enough to defeat appellants' claim of entitlement based upon the Medical Manual and Health Financing Agency regulation.
 
 B. The APA
 
 47
 Sloan and Sunew next rely on the APA as a basis for their property interest. They maintain the APA bestows upon them a substantive right to have a reviewing court set aside a carrier's application of the "one-and-one-half" rule as "arbitrary and capricious." However, appellants cite no authority to support this proposition. As the district court observed, a statute that simply provides a standard for review of agency action cannot furnish the substantive basis for a claim of entitlement to a property interest. The APA is merely a procedural vehicle for review of agency action; it does not confer a substantive right to be free from arbitrary agency action. Cf. Federal Hous. Partners IV v. Cisneros, 55 F.3d 362, 368 (8th Cir.1995) (holding that in the rule-making context, failure to follow APA procedures does not give rise to a property interest). Hence, the APA may not serve as a source for an alleged property interest.
 
 C. Prior ALJ Decisions
 
 48
 As a final option, appellants argue that their property interest arose from ALJ decisions rendered in appeals brought by assignee-physicians. Here appellants tread on more solid ground.
 
 
 49
 Assignee-physicians have been free at all times to appeal the carriers' application of the "one-and-one-half" rule to invasive monitoring. In the 16-month period from January 1992 until April 1994, ALJs reversed the carriers' application of the rule well over 100 times. This pattern not only began many months before Sunew and Sloan rendered the services at issue in this litigation on October 5, 1992 and September 29, 1993 respectively, but also ultimately prompted the Health Financing Agency to announce that, effective January 1, 1994, the rule would no longer be applied to invasive monitoring.
 
 
 50
 The district court found, as a matter of law, that these ALJ decisions could not serve as an authoritative source for a property interest. It limited its search of possible sources of property interests to traditional ones--statutes, regulations, and ordinances. But the Supreme Court, in Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), expressly rejected such a narrow and formalistic approach by stating that property interests may be established through such diverse sources as unwritten common law and informal institutional policies and practices. See id. at 602-03, 92 S.Ct. 2694. "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit...." Id. at 601, 92 S.Ct. 2694 (citing Roth, 408 U.S. at 577, 92 S.Ct. 2701). We too have embraced this broader approach as to what may constitute a possible source of a property interest. See, e.g., Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775, 782-83 (2d Cir.1991) (finding a property interest based on the conduct and practices of a hospital's physician residency program).
 
 
 51
 Conceding that decisional law can be the source of a property interest, defendants nevertheless assert that the particular ALJ decisions upon which appellants rely are not relevant decisional law. First, they aver these decisions are irrelevant because Sloan and Sunew, as non-assigned physicians, had neither a right of appeal to the ALJs, nor a basis to believe themselves entitled to ALJ review. But appellants' subjective expectation is irrelevant when determining whether one is entitled to procedural due process protection. See Sindermann, 408 U.S. at 603, 92 S.Ct. 2694. Further, defendants' argument confuses the substantive property interest at issue, with the procedural mechanism for enforcing that right. The issue of what constitutes a substantive property interest is analytically distinct from the issue of what procedures must be followed if such interest is to be taken away. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). As a result, Sloan's and Sunew's substantive property interest cannot be defined by the procedures that deprived them of it.
 
 
 52
 To be sure, to determine the existence of the substantive property interest, we must assess whether controlling Medicare law generally entitles anesthesiologists to a Medicare-approved charge for their services based upon the amount promulgated in the statutory fee schedule, without being subject to modification by the "one-and-one-half" rule. That body of law includes ALJ decisions overturning the carriers' application of the rule to assignee-physicians. Those decisions rested on general medical practice, independent of individual factual issues. Most importantly, the legal conclusions did not hinge upon the fact that the anesthesiologists appealing the determination happened to be assignee-physicians. Thus, Sloan and Sunew may rely on these decisions as an authoritative source of substantive Medicare law.
 
 
 53
 Defendants next believe we should ignore the ALJ decisions because these decisions do not officially set Department policy. They point out that the Medicare statute authorizes the defendant Secretary--and not ALJs--to determine the rates and amounts of payments to be made to physicians. While the Secretary may officially set policy, ALJ decisions nevertheless remain persuasive authority in interpreting Medicare law. The D.C. Circuit in Tarpeh-Doe v. United States, 904 F.2d 719, 724 (D.C.Cir.1990), ruled that the "consistent practice of a decisional body" could create a property interest "even in the absence of express regulatory language or in the face of ostensibly contradictory agency policy statements." Here, the Secretary not only failed to issue a contradictory statement or exercise her authority to overturn the ALJ decisions, but, in fact, effectively endorsed those decisions by subsequently adopting a regulation prohibiting prospective application of the "one-and-one-half" rule.
 
 
 54
 The constant, consistent pattern of ALJ decisions in the case at hand is sufficient to create a property interest. The ALJs are quasi-judicial officers, statutorily charged with interpreting Medicare law. As such, their extensive experience in dealing with that statute, combined with the succession of decisions consistently overturning application of the "one-and-one-half" rule to invasive monitoring, supports appellants' claim of entitlement to a Medicare-approved charge that is not subject to the rule. See id. at 724 ("It is possible, of course, for a legitimate expectation to arise based upon the consistent practice of a decisional body....").
 
 
 55
 As a consequence, Sloan and Sunew demonstrated a cognizable property interest, and the district court's contrary conclusion must be set aside. Having defined the substantive nature of appellants' property interest, we ordinarily would turn our attention to the adequacy of the procedures for depriving them of that right. So far as the present record reveals, no procedure was apparently observed. Nonetheless, the district court never reached the question of procedure, and we remand this issue for its ruling in the first instance as to what process was due appellants, and whether they were accorded it.
 
 CONCLUSION
 
 56
 For the reasons stated, we affirm the order appealed from insofar as it dismisses appellants' APA and Equal Protection claims. Insofar as the district court denied the existence of a protectable property interest, we reverse and remand appellants' due process claim to allow the district court to determine under traditional due process analysis what process appellants were due and whether such process was accorded them.
 
 
 57
 Affirmed in part, reversed in part, and remanded.
 
 
 
 *
 Hon. Robert W. Sweet, Senior Judge, United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 The fee schedule consists of procedure code numbers with relative value units (RVUs) assigned to each code. The carrier must select the appropriate procedure code and multiply the applicable RVU by a universal conversion factor, which is approved each year by Congress. That product is then adjusted for local economic differences. See 42 U.S.C. § 1395w-4(b); 42 C.F.R. § 414.20
 
 
 [2]
 Because the district court disposed of plaintiffs' complaint before it had the opportunity to certify a class, we treat this appeal as though it were brought only by the individual physicians