No. 102,324

VILLAGE VILLA, *et al.*, *Appellants*, v. KANSAS HEALTH POLICY
AUTHORITY, *Appellee.*
(291 P.3d 1056)

Opinion filed January 11, 2013.

*Larry G. Karns*, of Glenn, Cornish, Hanson & Karns, Chartered, of Topeka, argued the cause and was on the brief for appellants.

*Joann E. Corpstein*, chief counsel, of Kansas Department on Aging, argued the cause and *R. Greg Wright* and *Susan Barker Andrews*, of the same department, were with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: This is a Medicaid reimbursement appeal under the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* (now the Kansas Judicial Review Act, K.S.A. 2011 Supp. 77-601 *et seq.*). Three corporations, each of which owns a nursing home facility, want their reimbursement rates recalculated because they believe there was a change of ownership authorizing the adjustments. The Kansas Department on Aging (KDOA) and Kansas Health Policy Authority (KHPA) denied recalculation because of common ownership between the buyers and sellers, which they determined barred the rate changes. On review, the district court agreed. On appeal, the corporations maintain that

the agency orders are invalid, violate the Equal Protection and Due Process Clauses of the United States Constitution, and are vague. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Prior to January 1, 2005, Virgil Goracke owned 20 percent of three nursing home facilities—Indian Trails Manor, Inc., d/b/a Indian Trails Mental Health Living Center, Inc.; Manor of Nortonville, Inc., d/b/a Village Villa; and Flint Hills, Inc., d/b/a Vintage Manor. There is no dispute these entities were Medicaid-certified nursing facilities. Goracke signed the 2003 and 2004 Medicaid cost reports for each facility as "Secretary and Owner." He also solely owned a separate company responsible for managing these three facilities.

Effective January 1, 2005, three other corporations owned entirely by Goracke purchased the three nursing homes. Goracke renamed them: Village Villa, Inc., f/k/a Manor of Nortonville, Inc., d/b/a Village Villa; Providence Living Center, Inc., f/k/a Indian Trails Manor, Inc., d/b/a Indian Trails Mental Health Living Center; and Flint Hills Care Center, Inc., f/k/a Flint Hills, Inc., d/b/a Vintage Manor. Goracke signed the 2005 Medicaid cost reports for each facility as "President and Owner."

Medicaid is a joint federal-state program providing medical assistance to eligible individuals. Its purpose is to provide medical and rehabilitation assistance to those who qualify as poor, aged, blind, or disabled. See 42 U.S.C. § 1396 *et seq.* (2006); *State v. McWilliams*, 295 Kan. 92, 96, 283 P.3d 187 (2012). States are not required to participate in the Medicaid program, but once one elects to do so, it must comply with applicable federal regulations. See 42 U.S.C. § 1396a(1) (2006); *Country Club Home, Inc. v. Harder*, 228 Kan. 756, 763, 620 P.2d 1140 (1980), *modified* 228 Kan. 802, 623 P.2d 505 (1981). Kansas made this election for the relevant time period.

Effective July 1, 2006, KHPA became responsible for the state Medicaid plan's supervision and administration. K.S.A. 2006 Supp. 75-7409. At that time certain "powers, duties and functions of the division of health policy and finance within the department of ad-

ministration and the director of health policy and finance [were] transferred to and imposed upon the [KHPA]." K.S.A. 2006 Supp. 75-7413. At the time the present matter arose, KHPA was responsible for defending the regulations now questioned, which were promulgated by the Secretary of Social and Rehabilitation Services. See K.S.A. 39-708c.

Since then, mergers within Kansas government altered the agencies responsible for the state's Medicaid program administration. Through Executive Reorganization Order No. 38, effective July 1, 2011, Governor Sam Brownback abolished KHPA and established the Kansas Division of Health Care Finance within the Kansas Department of Health and Environment. This order transferred all KHPA statutory powers, duties, and functions to the Kansas Department of Health and Environment, the Division of Health Care Finance, the Secretary, and the Director. As such, the responsibility for the supervision and administration of the Kansas Medicaid program is now with the Kansas Department of Health and Environment. See L. 2012, ch. 102, sec. 40.

A Medicaid services provider does not bill eligible patients for covered services. Rather, the provider is reimbursed by the government according to preestablished rates. See 42 U.S.C. § 1396a(30)(A) (2006); K.S.A. 39-708a; K.S.A. 39-708c(s), (x). A statutory amendment enacted during the 2006 Kansas legislative session changed the base year for computing the Medicaid reimbursement rates at issue in this case. Specifically, the law stated that beginning with fiscal year 2007, base year rates would be calculated by averaging together 2003, 2004, and 2005 cost reports. K.S.A. 2006 Supp. 75-5958.

KDOA, which under K.S.A. 2006 Supp. 75-5903(a) and K.S.A. 2006 Supp. 75-5908(d) was responsible for receiving and disbursing funds made available under any federal program for the aging including the Medicaid program, published a notice in the Kansas Register about this change in the base year. Additionally, in notifying providers operating a facility for 12 or more months on December 31 that they were to file a calendar year cost report, KDOA's notice told providers that if a "non-arms length change of

provider takes place . . . the facility will be treated as an ongoing operation."

KDOA sent letters to Village Villa, Providence Living Center, and Flint Hills Care Center (collectively Village Villa) announcing the new Medicaid per diem rate for each facility effective July 1, 2006. The letters indicated that the base data for calculating the new rates was the combined cost data from each facility's calendar year costs reports for 2003, 2004, and 2005. The letters also alerted the recipients to their right to request a fair hearing if they disagreed with the new rates. This notice was in compliance with K.A.R. 30-7-65.

In response, Village Villa requested a hearing with the Kansas Department of Administration challenging the new reimbursement rates for each facility. It argued that because the facilities underwent a change of ownership in 2005, the rates should be based exclusively on the new owner's first calendar year cost reports, *i.e.*, only the 2005 cost reports, which presumably would have generated more Medicaid revenue.

KDOA moved for summary judgment, arguing the applicable regulations prevented it from applying anything other than the average of the 2003, 2004, and 2005 cost reports because Village Villa had not undergone a "change of ownership" as defined in K.A.R. 30-10-1a(a)(7).Village Villa countered that KDOA was misapplying the regulations and that such application was unconstitutional because it did not require the agency to evaluate the arm's length legitimacy of each transaction.

The hearing officer rejected Village Villa's arguments, finding that the parties to each transaction were "related" under K.A.R. 30-10-1a(36)(C) because Goracke had owned 20 percent of the facilities being sold to corporations owned entirely by Goracke, constituting "common ownership" under K.A.R. 30-10-1a(9). Thus, "by operation of law for Medicaid reimbursement purposes—there was no change of ownership and no arms-length transaction," and the correct method for calculating the reimbursement rate was averaging the 2003, 2004, and 2005 cost reports.

The hearing officer also correctly noted there was no administrative authority to address Village Villa's claim that the reimburse-

ment regulations were unconstitutional. See *Zarda v. State*, 250 Kan. 364, Syl. 3, 826 P.2d 1365, *cert. denied* 504 U.S. 973 (1992); *Kaufman v. State Dept. of SRS*, 248 Kan. 951, 954, 811 P.2d 876 (1991) ("Administrative boards and agencies may not rule on constitutional questions; therefore, the issue of the constitutionality of a state statute or an administrative regulation must be raised when the case is appealed to a court of law.").

Village Villa appealed the hearing officer's initial order to KHPA, which agreed with the ruling that the parties to the January 2005 transaction were "related." And it too noted it had no authority to address the constitutional claims.

Village Villa then petitioned the Shawnee County District Court for judicial review of KHPA's final order under the Act for Judicial Review and Civil Enforcement of Agency Actions. The district court affirmed KHPA's holding that there had not been a "change of ownership" from the January 2005 transaction even if there had been an "arm's length transaction" for other purposes. The court also concluded the reimbursement regulations were constitutional. Village Villa timely appealed the district court's decision. This court transferred the case on its own motion under K.S.A. 20-3018(c).

## DISCUSSION

The Secretary of Social and Rehabilitation Services promulgated the regulation for determining whether the January 2005 acquisition by Goracke's corporations constituted a change of ownership for Medicaid reimbursement purposes under the authority granted by K.S.A. 39-708c. The relevant subsections of that regulation are K.A.R. 30-10-1a(a)(7), (9), and (36)(C). These provisions have the force and effect of law. K.S.A. 77-425.

### Regulations

K.A.R. 30-10-1a defines words and terms used in Article 10 (Adult Care Home Program) of the Kansas Administrative Regulations. A "change of ownership" is defined in K.A.R. 30-10-la(a)(7) as "a transfer of rights and interests in real and personal property used for nursing facility services *through an arm's-length transac-*

*tion between unrelated persons or legal entities."* (Emphasis added.)

"Related parties" are defined as:

"two or more parties with a relationship in which one party has the ability to influence another party to the transaction in the following manner:

. . . .

(C) when any party considered a related party to a previous owner or operator becomes the employee, or otherwise functions in any capacity on behalf of a subsequent owner or operator. Related parties shall include parties related by family, business, or financial association, or by *common ownership or control. Transactions between related parties shall not be considered to have arisen through arm's-length negotiations."* (Emphasis added.) K.A.R. 30-10-1a(a)(36)(C).

Notably for this appeal, " 'Common ownership' means that an entity holds a minimum of five percent ownership or equity in the provider facility or in a company engaged in business with the provider facility." K.A.R. 30-10-1a(a)(9).

*KHPA's actions under K.S.A. 77-621(c)(3), (4), (7), and (8)*

Village Villa's overarching argument is that KHPA's reliance on "the 5% rule" and its refusal to investigate or recognize the "otherwise fully arm's length business transaction" is shocking, arbitrary, and capricious. K.S.A. 77-621 governs judicial review of agency actions. The burden of proving the invalidity of an agency's action falls on the party making that claim. K.S.A. 77-621(a)(1).

At the outset, we note Village Villa incorrectly asserts that the 2009 amendments to K.S.A. 77-621 apply to our analysis. See *Redd v. Kansas Truck Center*, 291 Kan. 176, Syl. ¶ 1, 239 P.3d 66 (2010) ("[T]he 2009 Kansas Judicial Review Act amendments to the standard of review apply only prospectively to agency decisions issued on or after July 1, 2009."). We apply the law applicable at the time of the agency action under review. K.S.A. 77-621(a)(2).

Village Villa appears to argue invalidity under K.S.A. 77-621(c)(1), (3), (4), (7), and (8). At the time of KHPA's decision, K.S.A. 77-621 stated in pertinent part:

"(c) The court shall grant relief only if it determines any one or more of the following:

(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

. . . .

(3) the agency has not decided an issue requiring resolution;

(4) the agency has erroneously interpreted or applied the law;

. . . .

(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

(8) the agency action is otherwise unreasonable, arbitrary or capricious."

With regard to K.S.A. 77-621(c)(3), (4), and (8), Village Villa contends KHPA ignored the language of K.A.R. 30-10-1a(a)(36), which it interprets to require "one party [having] the ability to influence another party to the transaction." Village Villa likewise challenges KHPA's failure to make findings on the ability to influence under K.A.R. 30-10-1a(a)(10), which defines "control" as meaning that "an individual or organization has the power . . . to significantly influence or direct the action . . . of an organization or facility." When a party contends an agency erroneously interpreted or applied the law, we exercise unlimited review and need not give deference to the agency's interpretation. *Saylor v. Westar Energy, Inc.*, 292 Kan. 610, 614, 256 P.3d 828 (2011).

Village Villa incorrectly reads K.A.R. 30-10-1a(a)(36). The regulation sets forth that " 'related parties' " are those in which one party to the transaction has the ability to influence another party "in the following manner." And under subsection (C) of K.A.R. 30-10-1a(a)(36), "common ownership" is one way in which a party to a transaction may have the ability to influence the other. In addition, K.A.R. 30-10-1a(a)(36)(C) provides that "related parties" include those related by "common ownership *or* control." (Emphasis added). And because the term "or" separates "common ownership" and "control," only one of those conditions need be met for parties to be deemed related. For these reasons, we reject Village Villa's arguments that KHPA failed to decide an issue requiring resolution, erroneously interpreted or applied the regulation, and took action that was arbitrary or capricious.

Village Villa further asserts that factual support for KHPA's action is lacking. But the basic facts are not in dispute—Village Villa concedes the three corporations that purchased the nursing facil-

ities were solely owned by Goracke and that he previously owned 20 percent of the corporations that sold the nursing facilities to the three purchasing companies. These concessions defeat any argument Village Villa makes regarding the nature of the evidence supporting KHPA's decision. Accordingly, Village Villa's argument under K.S.A. 77-621(c)(7) fails as well.

## Constitutionality of K.A.R. 30-10-1a(a)(7), (9), and (36)

We next consider Village Villa's claim that K.A.R. 30-10-1a(a)(7), (9), and (36) are unconstitutional. This court may grant relief only if "[t]he agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied." K.S.A. 77-621(c)(1).

Determining whether a regulation meets constitutional muster requires statutory interpretation, which is a question of law over which this court has unlimited review. See *National Council on Compensation Ins. v. Todd*, 258 Kan. 535, 539, 905 P.2d 114 (1995). And as stated above, an agency's interpretation of a statute or regulation is not afforded any significant deference on judicial review. *Kansas One-Call System, Inc. v. State*, 294 Kan. 220, 225-26, 274 P.3d 625 (2012) (citing *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs*, 290 Kan. 446, 457, 228 P.3d 403 [2010]).

### Equal Protection

Village Villa argues the regulations at issue violate the Equal Protection Clause of the United States Constitution because they treat an owner of nursing facilities who previously owned at least 5 percent of the facilities he or she purchased but had no control or significant influence over the facilities differently from a new owner who similarly had no control or significant influence over the facilities. Village Villa contends that to comply with the Equal Protection Clause, the agency should be required to make findings of fact as to whether each individual sale is an arm's-length and valid business transaction despite having been between "related parties," as that term is defined in the regulation. The Fourteenth Amendment to the United States Constitution provides in part:

"No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

An equal protection analysis has three steps. First, a court must determine the nature of the statutory classifications and examine whether these classifications result in disparate treatment of arguably indistinguishable classes of individuals. *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 315, 255 P.3d 1186 (2011). If so, the Equal Protection Clause is implicated. In the second step, a court examines which rights the classifications affect because the nature of those rights dictates the scrutiny applied when the statute or regulation is reviewed. There are three levels of scrutiny: (1) the rational basis standard to determine whether a statutory classification bears some reasonable relationship to a valid legislative purpose; (2) the heightened or intermediate scrutiny standard to determine whether a statutory classification substantially furthers a legitimate legislative purpose; and (3) the strict scrutiny standard to determine whether a statutory classification is necessary to serve some compelling state interest. *Miller v. Johnson*, 295 Kan. 636, 666, 289 P.3d 1098 (2012) (citing *Kanza Rail-Trails Conservancy*, 292 Kan. at 316). In the final step of analysis, a court determines whether the relationship between the classifications and the object desired to be obtained withstands the applicable level of scrutiny. *Miller*, 295 Kan. at 666 (citing *Kanza Rail-Trails Conservancy*, 292 Kan. at 316).

The first question is whether K.A.R. 30-10-1a(a)(7), (9), and (36) create disparate treatment of similarly situated individuals. The party challenging constitutionality has the burden of demonstrating that he or she is similarly situated to others treated differently. *State v. Huerta*, 291 Kan. 831, 834, 247 P.3d 1043 (2011). As such, "the parameters of a court's consideration of whether individuals are similarly situated is set by the distinctions argued by the complaining party." *State v. Salas*, 289 Kan. 245, 249, 210 P.3d 635 (2009) (citing *Heller v. Doe*, 509 U.S. 312, 319-21, 113 S. Ct. 2637, 125 L. Ed. 2d 257 [1993]).

The regulations distinguish between parties that own or have equity in 5 percent or more of a provider facility and those who own or have equity in less than 5 percent. Unlike the former, the

latter are able to purchase a provider facility in which they own or have equity and be treated as a new owner for the purposes of calculating Medicaid reimbursement rates. KHPA argues there is no disparate treatment because "related party transactions are not similarly situated to those transactions involving truly arm's-length *bonafide* unrelated entities."

Village Villa counters that the regulations treat similarly situated parties differently, *e.g.*, an owner with a 4 percent interest is treated differently from one who owns 5 percent though their actual control over the provider facility may be nearly identical. On this point, we agree with Village Villa. One who owns 4 percent of a provider facility is similarly situated to one who owns 5 percent, and these regulations treat these two groups differently. Therefore, we move to the next step and determine what level of scrutiny applies.

Village Villa correctly concedes that the appropriate scrutiny level is the rational basis test. See *In re Tax Appeal of Weisgerber*, 285 Kan. 98, 104, 169 P.3d 321 (2007) (when complaint is that a law causes economic disparity, the rational basis test or "reasonable basis test" is used to determine if the law violates the Equal Protection Clause); see also *Downtown Bar and Grill v. State*, 294 Kan. 188, 194, 273 P.3d 709 (2012) (if legislative classification does not target a suspect class or burden a fundamental right, court applies rational basis test).

The rational basis standard requires only that a statutory classification bear some reasonable relationship to a valid legislative purpose. *Miller*, 295 Kan. at 666 (citing *Kanza Rail-Trails Conservancy*, 292 Kan. at 316). As a result, the standard is a lenient one. *Weisgerber*, 285 Kan. at 105. A statute or regulation fails the rational basis test only if the classification at issue " 'rests on grounds wholly irrelevant to the achievement of the State's legitimate objective.' " *Weisgerber*, 285 Kan. at 105 (quoting *Leiker v. Gafford*, 245 Kan. 325, 363-64, 778 P.2d 823 [1989]). And the complaining party has the burden to negate every conceivable rational basis that might support the classification challenged. *Miller*, 295 Kan. at 668 (citing *Downtown Bar and Grill*, 294 Kan. 188, Syl. ¶ 10). " [T]he party must demonstrate that "no set of circumstances exist" that

survive constitutional muster. [Citation omitted.]' " *Downtown Bar and Grill*, 294 Kan. at 195.

KHPA argues there is a valid legislative purpose for the regulations at issue because they ensure the Kansas Medicaid program does not incur artificially inflated costs due to related parties engaging in self-dealing. This, it argues, keeps the government's costs as low as possible and makes care more widely available to those in need. And for its part, Village Villa makes no arguments as to whether the State has a legitimate purpose justifying the regulations other than to state: "[T]he costs to the State would be no different if a third party purchased these facilities for the same consideration paid by [Village Villa]. As long as the price paid was fair and reasonable, the State's interest is protected."

Village Villa instead focuses on the State's method for achieving its goal. Specifically, it argues the State could prevent fraud and control escalating prices by making a factual inquiry of every transaction regarding the ability of control and possibility of unfair self-dealing. It cites *South Boston General Hosp. v. Blue Cross of Va.*, 409 F. Supp. 1380 (W.D. Va. 1976). In that case, the Secretary of Health, Education, and Welfare refused to reimburse a qualified provider of Medicare services for costs paid to the facility's prior owner on the basis of a federal related-parties rule (see 20 C.F.R. §§ 405.415, 405.419, and 405.427). On appeal, the district court found the regulations did not further the purpose of a federal Medicare statute, 42 U.S.C. § 1395x(v)(1)(A), which required the Secretary to reimburse providers of "needed health services." The court cut from whole cloth a requirement that the Secretary scrutinize each related-party transaction to ensure above-board related-party transactions were not being treated inequitably when compared to unrelated-party transactions. *South Boston General Hosp.*, 409 F. Supp. at 1384-85.

But numerous courts have declined to follow *South Boston*. See, e.g., *Sid Peterson Memorial Hosp. v. Thompson*, 274 F.3d 301, 312-13 (5th Cir. 2001) (rejecting *South Boston's* reasoning because "[t]he need for broad prophylactic rules [such as the related-party rule] is particularly apparent in a program as complex and ripe with the potential for abuse as the Medicare reimbursement scheme");

*American Hospital Management Corp. v. Harris*, 638 F.2d 1208, 1213 n.9 (9th Cir. 1981) ("[*South Boston*] cited no case authority for its conclusion that the Secretary must individually scrutinize transactions involving related entities for fairness."). And these courts found related-party regulations promote valid legislative purposes in support of federal Medicare law. We agree.

In *Sid Peterson* and *American Hospital*, both the Fifth and the Ninth Circuit Courts of Appeals upheld federal regulations disallowing Medicare reimbursements when transactions were between related parties. The regulations at issue in both cases, in part, identified parties as being related when one had control of another because of significant influence. *Sid Peterson*, 274 F.3d at 304, 311-12; *American Hospital*, 638 F.2d at 1209, 1212-13 (finding the exception in the regulation allowing related parties to demonstrate that they conducted a bona fide arms-length transaction helped establish the lawfulness of the regulation). And in identifying the valid purpose of these regulations, the *Sid Peterson* court described the "related-party rule" as " 'prophylactic' " in that it

"involves a judgment that the probability of abuse in related transactions is high enough that it is more efficient to prevent the opportunity for abuse from arising by prohibiting certain provider/lender relationships that are likely to give rise to self-dealing transactions, rather than to try to detect actual incidents of abuse. [Citation omitted.]" *Sid Peterson*, 274 F.3d at 304.

Similarly, the *American Hospital* court held the regulation at issue in that case was validly designed to prevent "seemingly separate entities from engaging in what is in fact self-dealing at the expense of the Medicare program." *American Hospital*, 638 F.2d at 1212. The court noted the regulation may not achieve its objective with mathematical precision, but it upheld the regulation nonetheless because it had a reasonable relationship to the enabling legislation, 42 U.S.C. § 1395x(v)(1)(A), it was designed to implement. *American Hospital*, 638 F.2d at 1212-13.

More pertinently, the *American Hospital* court also considered the argument that the regulation violated equal protection principles and held there was no constitutional infirmity. The court concluded the classification of " 'related entity' " was a reasonable method of achieving the valid legislative purpose of preventing re-

imbursement of excessive charges resulting from self-dealing. *American Hospital*, 638 F.2d at 1213. Similarly, in *Fairfax Hospital Ass'n, Inc. v. Califano*, 585 F.2d 602 (4th Cir. 1978), the Fourth Circuit Court of Appeals had previously addressed the constitutionality of the same regulation at issue in *American Hospital* and found no violation of the Equal Protection Clause. The court held:

"Particularly in a program as complex as the Medicare program, with its large numbers of providers and suppliers . . . , the Secretary, in his regulations may make, indeed he must make, ' "rough accommodations illogical, it may be, and unscientific," ' using generalized classifications governing the methods of calculating 'reasonable cost' when it is obvious that individualized cost calculations are both not administratively practical and unduly expensive." *Fairfax*, 585 F.2d at 606 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S. Ct. 1153, 25 L. Ed. 2d 491 [1970]; *Weinberger v. Salfi*, 422 U.S. 749, 773-80, 95 S. Ct. 2457, 45 L. Ed. 2d 522 [1975]).

The court concluded that given the potential for abuse in charges between related parties, regulations formulated "to prescribe reasonable classifications to prevent such abuse" were proper. *Fairfax*, 585 F.2d at 607.

Both *Sid Peterson* and *American Hospital* held that the related-party regulations were consistent with the Secretary's rule-making authority under 42 U.S.C. § 1395x(v)(1)(A), which, as stated, required the Secretary to adopt regulations resulting in reimbursement of actual costs. *Sid Peterson*, 274 F.3d at 307, 313; *American Hospital*, 638 F.2d at 1212. A comparable federal Medicaid statute offers compelling support for KHPA's arguments regarding the legislative purpose behind the 5 percent rule. 42 U.S.C. § 1396a(30)(A) (2006) states:

"A State plan for medical assistance must

. . . .

"(30)(A) provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in section 1396b(i)(4) of this title) as may be necessary to safeguard against unnecessary utilization of such care and services and *to assure that payments are consistent with efficiency, economy, and quality of care* and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." (Emphasis added.)

As to what would make a state plan inefficient and uneconomical, the Third Circuit Court of Appeals has held that provider payments that are too high make a program noncompliant with the federal requirement. *Pennsylvania Pharmacists Ass'n v. Houstoun*, 283 F.3d 531, 537 (3d Cir. 2002). And other jurisdictions have recognized that a state has a legitimate interest in controlling Medicaid costs. See *St. Louis South Park v. Missouri DSS*, 857 S.W. 2d 304, 307 (Mo. App. 1993) (controlling the costs of its Medicaid program in setting reimbursement rates for participating nursing homes is a legitimate state interest); *In re NYAHSA Litigation*, 318 F. Supp. 2d 30, 42 (N.D.N.Y. 2004) ("Preserving the financial integrity of welfare programs is a legitimate state interest."). The United States Supreme Court has also emphasized that a state has "broad discretion" when financing Medicaid benefits. *Pharmaceutical Research and Mfrs. of America v. Walsh*, 538 U.S. 644, 666, 123 S. Ct. 1855, 155 L. Ed. 2d 889 (2003).

While the classification at issue in *South Boston*, *Sid Peterson*, *American Hospital*, and *Fairfax* was "related parties" and the classification Village Villa challenges concerns parties that own or have equity in 5 percent or more of a provider facility, the legislative purpose is the same. The district court in rejecting Village Villa's argument found the purpose of Kansas' 5 percent rule/common ownership regulations to be "controlling and preserving the financial integrity of the Medicaid program." We agree and hold that this is a valid legislative purpose.

The remaining question is whether the classification created by the 5 percent rule bears a reasonable relationship to this valid legislative purpose we have just identified. And we find support for the 5 percent rule within K.A.R. 30-10-1a(a)(9) is found in 42 C.F.R. § 455.1 *et seq.* (2006), which sets forth requirements for a state fraud detection and investigation program and for disclosure of information on ownership and control. 42 C.F.R. § 455.101 (2006), which is the definitions section of the subpart on provider disclosure, recites that a person with an ownership or control interest means a person or organization that has ownership, indirect ownership, or a combination of direct and indirect ownership totaling 5 percent or more in a disclosing entity. And although it is

unclear why the federal government chose to require disclosure at the 5 percent level, that requirement is evident in the original legislation, prior public law, and the legislative history. See 44 Fed. Reg. 41,644, July 17, 1979; H.R. 3, P.L. 95-142, October, 25, 1977, *as reprinted in* 1977 U.S.C.C.A.N. at 91 Stat. 1175-78; H.R. No. 95-393 (Pt. II), at 39-40 (1977), *as reprinted in* 1977 U.S.C.C.A.N. at 3042.

In addition, comments at the beginning of the published final regulation address public suggestions that the reporting requirements for a "significant business transaction" be changed from $25,000 and 5 percent to $100,000 and 10 percent. The agency's response was that many small providers would be engaged in business transactions amounting to less than $25,000—which was statutorily required—but the transactions would still account for a substantial amount of business. And to monitor those transactions the 5 percent rule was implemented. The agency's stated goal in promulgating a $25,000 and 5 percent requirement was to reduce the probability of Medicaid fraud. 44 Fed. Reg. 41,638, July, 17, 1979.

Village Villa contends this regulation is not binding and is an inappropriate comparison as its purpose, which is disclosure of all shareholders to ensure convicted criminals are not participating in federal health care programs, has nothing to do with who controls an organization for purposes of sale transactions. But we disagree. Medicaid's integrity—and specifically the goal of preventing fraud—is a valid purpose for Kansas' 5 percent rule/common ownership regulation. The federal government's 5 percent disclosure requirement, implemented to help prevent fraud, is a reasonable method for the state to draw upon in attempting to prevent fraud within its own program.

Reduced to its essence, Village Villa's overall contention is that there is a better way to achieve the objective of fraud prevention than the State's chosen approach. But whether there is a better way is not the question. See *Dandridge*, 397 U.S. at 485 ("In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable

basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' [Citation omitted.]"). This court is obligated to determine whether there is a rational basis for the regulation in place.

We hold that the common-ownership classification of K.A.R. 30-10-1a(a)(9) bears a reasonable relationship to a valid legislative purpose of controlling Medicaid costs. Village Villa failed to meet its burden to negate this rational basis. K.A.R. 30-10-a(a)(7), (9), and (36) do not violate equal protection principles.

### Due Process

Village Villa next argues the regulations violate both procedural and substantive due process requirements and are void for vagueness. We consider first procedural due process, which requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Winston v. Kansas Dept. of SRS*, 274 Kan. 396, 409, 49 P.3d 1274 (2002). The first determination a court must make when reviewing a procedural due process claim is whether a protected liberty or property interest is involved. It is only when a court finds a protected interest is implicated that it must then determine the nature and extent of the process that is due. *Winston*, 274 Kan. at 409.

Property interests are not created by the Constitution, rather they "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that *secure certain benefits and that support claims of entitlement to those benefits.*" (Emphasis added.) *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); see *Brown v. U.S.D. No. 333*, 261 Kan. 134, 150, 928 P.2d 57 (1996) (property or liberty interest not inherent in Due Process Clause but must be rooted in state law); *Harrison v. Long*, 241 Kan. 174, 178, 734 P.2d 1155 (1987) (same).

Village Villa contends it has a property interest in reimbursement and its 2005 calendar year cost reports should have been the basis of its rate of reimbursement. According to Village Villa, "[w]hen KDOA made its adjustment to [Village Villa's] costs reports, it de-

prived [Village Villa] of [its] property interests without due process of law." But it fails to identify what statute or regulations it relies on for this contention. Instead, it asserts only that "the Kansas regulations constitute the rules and form the basis of the mutually explicit understanding that supports [Village Villa's] claims of entitlement to reimbursement." This is a woefully insufficient platform upon which to launch a due process attack.

Village Villa relies on *Furlong v. Shalala*, 156 F.3d 384, 393 (2d Cir. 1998), to support its contention. The *Furlong* court had to decide whether physicians who had chosen to provide one kind of Medicare services were entitled to the same due process received by physicians who had chosen to provide another kind of Medicare services. The first step in this process was to determine if the physicians had a property interest in their reimbursements. The *Furlong* court rejected the providers' argument that a property right arose from the Medicare Manual, the accompanying agency regulations, or the Administrative Procedures Act, but it approved the physicians' argument that previous administrative law judge decisions created a property interest for all physician providers, not just ones who participated in one type of Medicare services. 156 F.3d at 394-95.

But *Furlong* is distinguishable from Village Villa's claim. First, Village Villa fails to cite the regulations it claims give birth to its property interest. Second, *Furlong* merely held a provider group had the same property interest that ALJs had already interpreted as an entitlement for a second group of providers—and regardless of their classification, the two groups had the same interest. Village Villa does not offer another instance in which Kansas regulations were interpreted to give a provider a property interest in reimbursement.

At least one federal circuit has suggested that some form of property interest may exist in Medicaid reimbursement. Under New York law, the Second Circuit Court of Appeals determined that while Medicaid providers have no property interest in future reimbursements, they have a property interest in Medicaid reimbursement for "services already performed in reliance on a duly promulgated reimbursement rate." *Oberlander v. Perales*, 740 F.2d 116, 120 (2d Cir. 1984), *superseded by statute on other*

*grounds as stated in Senape v. Constantino,* 936 F.2d 687, 690 n.4 (2d Cir. 1991); but see *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 89 (2d Cir. 1991) (holding Medicaid provider did not have property interest in Medicaid payments that were pending investigation); but see also *Personal Care Products, Inc. v. Hawkins,* 635 F.3d 155, 159 (5th Cir. 2011) (Texas statutory scheme does not create property interest in present reimbursement claims while past claims are under investigation for fraud).

And based in part on *Oberlander,* in *Painter v. Shalala,* 97 F.3d 1351, 1357-58 (10th Cir. 1996), the Tenth Circuit Court of Appeals assumed, "without deciding," that physicians have a property interest in receiving payment for Medicare services rendered. But the court concluded that physicians do not hold a property interest in having their reimbursement rates calculated in a particular manner. 97 F.3d at 1358.

To have a property interest in a governmental benefit, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth,* 408 U.S. at 577. A person's interest in a governmental benefit becomes a property interest for due process purposes "if there are rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972).

While Kansas providers may be entitled to reimbursement, *i.e.,* to get paid for services provided, Village Villa fails to identify any "rules or understandings" that create entitlement to a specific methodology for calculating rates of reimbursement year after year. And the federal government provides states with the authority to modify rates as needed so long as specific goals are met. See generally 42 U.S.C. § 1396a(30)(A).

Whether Medicaid reimbursement is a protected property interest is a question of first impression for this court, which we will not decide in the absence of clearly articulable claims regarding the entitlements at issue and the statutory or regulatory provisions that give rise to them. We conclude that Village Villa has failed to establish a property interest in reimbursement rates calculated in

a particular manner in the context of this case. Without such a property interest, its claim must fail.

As to its substantive due process claim, the United States Supreme Court has held that substantive due process does not protect economic liberties. *Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection*, 560 U.S. 702, 721, 130 S. Ct. 2592, 177 L. Ed. 2d 184 (2010) (citing *Lincoln Fed. Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 536, 69 S. Ct. 251, 93 L. Ed. 212 [1949]). Because Village Villa asserts an economic liberty was violated, *i.e.*, that reimbursement rates were improperly calculated, it has no substantive due process claim.

Village Villa next complains the district court erred by finding K.A.R. 30-10-1a (a)(7), (9), and (36) do not violate due process due to vagueness. Village Villa's chief complaint is that "any undefined degree of association by family, business, or financial association would appear to be prohibited unless the term 'or control' is also a requirement." It maintains such an interpretation is overly vague and, therefore, reasons that a related party's "ability to influence" or "control" a transaction must be considered.

The test for vagueness is a common-sense determination based on fundamental fairness. "A statute that 'either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application' violates the Fourteenth Amendment to the United States Constitution and is thus void for vagueness." *State v. Richardson*, 289 Kan. 118, 124, 209 P.3d 696 (2009) (quoting *State v. Dunn*, 233 Kan. 411, 418, 662 P.2d 1286 [1983]). Statutes regulating business are given greater leeway than those proscribing criminal conduct. *Kaufman v. Kansas Dept. of SRS*, 248 Kan. 951, 956, 811 P.2d 876 (1991). And " '[a] statute will not be declared void for vagueness when it employs words commonly used, previously judicially defined, or having a settled meaning in law.' " *Kaufman*, 248 Kan. at 958 (quoting *Kansas City Millwright Co., Inc. v. Kalb*, 221 Kan. 658, 663, 562 P.2d 65 [1977]).

The pertinent part of K.A.R. 30-10-1a(a)(36)(C) states: "Related parties shall include parties related by family, business, or financial association, or by common ownership or control." These are com-

monly used words. Village Villa fails to elaborate as to why it argues vagueness other than its bald allegation that the regulation is vague. Without any substance behind it, we deem the argument to be abandoned. See *Miller v. Johnson*, 295 Kan. 636, 2012 WL 4773559, at *36 (2012) (citing *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 714, 216 P.3d 170 [2009]) (claims made in passing without argument or support deemed waived and abandoned).

*Compliance with federal regulations*

Village Villa lastly asserts K.A.R. 30-10-1a(a)(7), (9), and (36)(C) contravene a purpose of the federal Medicaid regulations: encouraging provider participation by making sufficient payments "to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population." See 42 C.F.R. § 447.204 (2006). KHPA provides statistics demonstrating that it is meeting that purpose.

The appropriate supervisory federal agency—the Centers for Medicare and Medicaid Services (CMS)—has approved Kansas' Medicaid plan. Village Villa fails to address why CMS would approve the state plan if the Kansas regulations contravened this federal purpose or otherwise elaborate on its argument. Given this failure, we similarly deem this issue abandoned.

We conclude the district court correctly affirmed KHPA's final order regarding the application of K.A.R. 30-10-1a(a)(7), (9), and (36)(C) and appropriately rejected Village Villa's constitutional claims.

Affirmed.

LUCKERT, J. not participating.

MARQUARDT AND CAPLINGER, JJ., assigned.