NOT DESIGNATED FOR PUBLICATION

No. 119,976

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

JANEE LASHAUN DRYDEN,
*Appelllee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; TIMOTHY P. MCCARTHY, judge. Opinion filed June 7, 2019. Reversed and remanded with directions.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Catherine A. Zigtema*, of Zigtema Law Office LC, of Shawnee, for appellee.

Before BUSER, P.J., PIERRON and BRUNS, JJ.

PER CURIAM: The State appeals the district court's dismissal of an attempted first-degree murder charge against Janee Lashaun Dryden after a preliminary hearing. The State had charged Dryden in an amended criminal complaint with attempted first-degree murder and aggravated battery. At the conclusion of the preliminary hearing, the district court dismissed the attempted first-degree murder charge, ruling that the State failed to establish probable cause that Dryden premeditated the shooting of Bishop McTye. The State appeals and contends the district court erred by dismissing the attempted first-degree murder charge.

1

We conclude the State's argument has merit. Accordingly, we reverse and remand with directions to reinstate the criminal complaint charging Dryden with attempted first-degree premeditated murder and bind over the defendant on the charge for arraignment and further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of May 28, 2017, police officers arrived at Dryden's residence in response to a reported shooting. Upon the arrival of the officers, Dryden exited the home telling them, "I shot him. He touched her." This statement referred to Dryden's long-time boyfriend, McTye, and her daughter, S.D. Dryden also told officers that the "gun is on the table." Upon entering the home, the officers immediately located a revolver on the kitchen table.

Upstairs, Sergeant Joel Yeldell found McTye lying in the bathroom next to the master bedroom. McTye had blood on his leg, arms, and face. A trail of blood led from the bed in the master bedroom to the bathroom where McTye was found. He had sustained an injury just above his left knee consistent with a bullet wound and another wound above his eye.

McTye had difficulty communicating with officers. He could provide officers with his first name but could not recall his date of birth. Still, McTye told the officers that he thought Dryden shot him. McTye was transported to a hospital, where he was treated for three weeks.

The State initially charged Dryden with a single count of aggravated battery for knowingly causing great bodily harm or disfigurement to McTye. Later, the State amended the complaint to add a count of attempted first-degree premeditated murder.

2

A preliminary hearing occurred on August 13, 2018. At this hearing, the State called eight witnesses. A brief summary of the testimony is important to the resolution of this appeal. S.D. described Dryden's residence as a two-story house, with three bedrooms upstairs and the living room and kitchen downstairs. S.D.'s bedroom, her sister's bedroom, and Dryden's bedroom were all located on the second floor.

On May 27, 2017, Dryden hosted a barbecue at the home to celebrate Memorial Day. The barbeque started at about 2 p.m. and many family and friends attended, including McTye. Dryden and McTye had dated for about seven years.

S.D. testified that, although the adults were drinking, Dryden had not drunk a lot during the barbeque. Later that evening, S.D. left the barbeque to take a friend home and then returned to the residence. S.D. then went to sleep in her bedroom. Dryden, McTye, S.D.'s father, and her sister were still at the residence when S.D. went to bed.

S.D. awakened about 3 a.m. with McTye in her bedroom. According to S.D., McTye touched her with his finger and attempted to rape her. S.D. went downstairs and told her mother to get McTye out of the house. S.D. explained that she could not "form the words" necessary to tell Dryden that McTye attempted to rape her. According to S.D. Dryden went upstairs to confront McTye.

When Dryden came back downstairs, S.D. disclosed that McTye had touched her. At the preliminary hearing, S.D. testified that she could not remember what Dryden did after this conversation. In particular, S.D. could not recall hearing any gunshots, watching her mother go outside to her car, or going back upstairs. S.D. did recall, however, speaking with a detective about what happened during the incident.

Brandon Jones, Dryden's cousin, testified that he attended the barbeque and spent the night at Dryden's home. Jones and McTye were drinking while at the barbeque.

3

Around midnight, Jones fell asleep in the basement. Jones testified that he heard no gunshots that morning but was awakened by Dryden at about 4 a.m. or 5 a.m. Dryden told Jones that he needed to get upstairs. Jones recalled seeing a gun on the kitchen table, but he had difficulty remembering whether Dryden had a gun in her hand when she came downstairs to awaken him. Although Dryden asked Jones to check on McTye, he refused to go to the second floor because he felt uncomfortable. The police arrived shortly thereafter.

Quincey Johnson attended the barbeque. Johnson had known McTye for several years, but she noticed that McTye seemed aggressive and hostile during the barbeque. Johnson described McTye as "out of it" and suspected intoxication or drug use.

Johnson testified that she was with Dryden when S.D. came downstairs and told Dryden, "Mom you need to come and get him." Dryden and S.D. then went upstairs together. According to Johnson, at this time, there was no gun on the kitchen table. When Dryden came back downstairs with S.D., she asked Johnson to call S.D.'s father, Dwan, and tell him to come back to the residence. Uninformed as to why she needed to call Dwan, Johnson went out to the garage to call him. Johnson did not recall seeing Dryden go outside.

While Johnson was in the garage calling Dwan, she heard multiple gunshots from inside the house. Upon entering the residence, Johnson saw people crying. Johnson then returned to the garage to call the police after Dryden asked her to call 911. According to Johnson, she never saw Dryden holding a gun, but she saw one on the kitchen table after calling 911.

Sergeant Yeldell testified that upon his arrival at the Dryden residence, Dryden told him that she shot McTye and the gun was on the table. Sergeant Yeldell observed a revolver on the kitchen table. He also found McTye in the upstairs master bedroom, lying

4

on his back near the entrance to the bathroom. McTye appeared to be bleeding from several places. In particular, Sergeant Yeldell noticed an apparent bullet wound above McTye's knee. Blood had pooled on the bed and a six-foot trail of blood was found from the bed to the bathroom entrance. McTye was in pain and offered little information to officers.

Officer James Cole was also dispatched to the scene. He recalled Dryden say, "I shot him. He touched her. The gun is on the table." Based on his observations inside the house, Officer Cole believed the shooting occurred in the master bedroom. Although McTye had trouble communicating, he told Officer Cole that he thought his girlfriend shot him.

Kelsey Lynch, a crime scene investigator, testified about processing the crime scene. In investigating the shooting, Lynch collected a firearm, casings, and bullets. Lynch found the revolver on the kitchen table on top of a blue purse. The cylinder of the five-shot revolver contained five spent casings and no live rounds. Lynch also found live rounds in the master bedroom closet. Lynch recovered five spent bullets, four in walls and one in a pillow sham. Lynch performed a trajectory analysis on the four bullets in the walls. Lynch's trajectory analysis showed the bullets originated from the master bathroom and traveled towards the master bedroom. The bullets appeared to have a downward trajectory.

McTye testified at the preliminary hearing under a grant of use and derivative use immunity. McTye testified that he frequently spent the night at Dryden's home and the two individuals had no relationship problems prior to the day of the shooting. On May 27, 2017, McTye arrived at Dryden's house about 9 a.m. to prepare food for the barbeque. Although McTye acknowledged drinking vodka and becoming intoxicated, he denied taking any drugs that day. While McTye believed that Dryden drank alcohol during the barbeque, a subsequent blood alcohol test showed no presence of alcohol in her system.

McTye recalled while playing cards with Dryden, Dwan, and Dwan's girlfriend late at night, he began feeling slightly nauseous and decided to go to bed in Dryden's bedroom. On his way to the master bedroom, McTye "peeked" in both S.D.'s room and her sister's room because they were drinking earlier. McTye denied inappropriately touching S.D.

When McTye reached the master bedroom, he felt ill, so he went to the bathroom for a minute or two. After his nausea subsided, McTye sat on the bed and began taking off his shoes and watch. About this time, Dryden came upstairs and shouted "Get out of my house." McTye stood up and responded, "What are you talking about" just before Dryden began shooting at him. According to McTye, the first shot missed, but the second shot hit him in the left leg.

After he was shot, the next thing McTye remembered was awakening in the emergency room. He discovered the injury to his leg and his right thumb, which he believed were gunshot wounds. McTye also received a head wound which he thought resulted from a fall after he was shot. According to McTye, Dryden owned a firearm and she usually kept the gun in her purse or by her bed.

Detective Kenton Thompson testified about his interviews with S.D. She informed Detective Thompson that McTye inappropriately touched her while she was sleeping in her bedroom. This awakened S.D. and she went downstairs to tell Dryden about McTye's behavior. While S.D. indicated that McTye touched her, she did not provide specific details about the touching to Dryden.

During the interview, S.D. explained that after she told her mother that McTye touched her, Dryden went outside to her car, retrieved a handgun, came back inside the residence, and then went upstairs. After Dryden went upstairs, S.D. heard Dryden yelling at McTye to get out, gunshots, and a loud slam. After S.D. heard the gunshots, she went

6

upstairs to check on her mother. S.D. told Detective Thompson that she observed McTye sitting on the bed but she did not look at him directly.

At the close of evidence, Dryden argued that the State failed to show probable cause that she committed the crime of attempted first-degree premeditated murder. The district court bound Dryden over on Count I charging aggravated battery but agreed the State failed to establish probable cause to bind over the defendant on Count II charging attempted first-degree murder. In its ruling, the district judge reasoned:

> "And I understand that this is only a probable cause determination at preliminary hearing, but the Court believes that the State has to do so on all the elements of that probable cause and also that as case law says, there is evidence sufficient to cause a person of prudence and caution to conscientiously entertain a reasonable belief of the defendant's guilt as to that count.
> "I don't believe that the probable cause determination has been made on Count II [attempted first-degree murder], but I do believe that probable cause has been made on Count I [aggravated battery]."

When questioned by the State on which element it failed to prove, the district court judge responded, "I don't believe that there has been enough to meet the definition of premeditation under Kansas law." Dryden was arraigned on Count I charging aggravated battery and pled not guilty.

On August 27, 2018, at 12:28 p.m., the State filed a notice of appeal that it was appealing the district court's order dismissing the attempted first-degree murder charge. About three hours later, on motion of the State, the district court filed an order of dismissal, dismissing the aggravated battery charge without prejudice. The district court filed a journal entry dismissing the attempted first-degree murder charge on September 13, 2018.

7

At the outset, Dryden contends our court lacks jurisdiction over the State's appeal. She argues we are without jurisdiction because K.S.A. 2018 Supp. 22-3602(b)(1) allows the State to appeal from an order dismissing a *complaint* and not from an order merely dismissing a *charge* or *count*. Dryden also claims our court lacks jurisdiction because the State violated due process by improperly obtaining the order dismissing the aggravated battery charge.

A brief mention of our standards of review and the law pertaining to appellate jurisdiction is necessary. Whether jurisdiction exists is a question of law over which appellate courts exercise unlimited review. *State v. Smith*, 304 Kan. 916, 919, 377 P.3d 414 (2016). Additionally, interpretation of a statute is a question of law over which this court has unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015).

"The right to appeal is purely statutory and not a right contained in the United States or Kansas Constitutions." *State v. Rocheleau*, 307 Kan. 761, 763, 415 P.3d 422 (2018). This court only has appellate jurisdiction as bestowed by statute; with no statutory authority, this court has a duty to dismiss the appeal. *Jenkins v. Chicago Pacific Corp.*, 306 Kan. 1305, 1308, 403 P.3d 1231 (2017). An appellate court obtains jurisdiction only over the rulings identified in the notice of appeal. *State v. Garza*, 295 Kan. 326, 329, 286 P.3d 554 (2012).

*Appeal of the Dismissal of One Count of a Multiple-Count Complaint.*

The State's authority to appeal in a criminal case is limited by statute. The State may elect from the specific jurisdictional grounds in its appeal. *State v. Mburu*, 51 Kan. App. 2d 266, 269-70, 346 P.3d 1086 (2015). The appellate court has jurisdiction to entertain a State's appeal only if it is taken within time limitations and in the manner

8

prescribed by the applicable statutes. *State v. Sales*, 290 Kan. 130, 134, 224 P.3d 546 (2010). The State cannot expand its elected statutory basis for the appeal, and the appellate court may not sua sponte select the jurisdictional basis for an appeal by the State. *State v. LaPointe*, 305 Kan. 938, 954, 390 P.3d 7 (2017).

The State relies on K.S.A. 2018 Supp. 22-3602(b)(1) as the statutory authority allowing this appeal. That subsection provides that the State may appeal as a matter of right from "an order dismissing a complaint, information or indictment." K.S.A. 2018 Supp. 22-3602(b)(1). The State argues this appeal is properly before our court because, after the district court dismissed the attempted premeditated murder charge, the State dismissed the remaining aggravated battery charge against Dryden and filed a notice of appeal of the district court's dismissal of the attempted premeditated murder charge within the requisite time period.

Dryden counters that our court lacks jurisdiction under K.S.A. 2018 Supp. 22-3602(b)(1) because the State is not appealing an order dismissing a complaint, information, or indictment. Dryden reasons that K.S.A. 2018 Supp. 22-3602(b)(1) does not allow the State to appeal an order dismissing one count of a multiple-count complaint. Additionally, she claims the invited error doctrine precludes the State's voluntary dismissal of the aggravated battery charge from conferring appellate jurisdiction under K.S.A. 2018 Supp. 22-3602(b)(1).

As Dryden candidly acknowledges, her argument conflicts with Kansas Supreme Court caselaw interpreting K.S.A. 22-3602(b)(1): "It has long been held the State may appeal from an order quashing or setting aside one count of an information, although another count charging a different act is held sufficient or is not attacked." *State v. Zimmerman & Schmidt*, 233 Kan. 151, 154, 660 P.2d 960 (1983) (citing *State v. Levine*, 125 Kan. 360, 362, 264 P. 38 [1928]; *State v. Lumber Co.*, 83 Kan. 399, Syl. ¶ 1, 111 P. 484 [1910]). Significantly, in *Zimmerman*, our Supreme Court held that an appeal from a

9

district court's order dismissing a single count of a multiple-count complaint after a preliminary hearing is authorized by K.S.A. 22-3602(b)(1) as a matter of right. 233 Kan. at 154-55.

Because the district court and the appellate courts may not have jurisdiction of a pending case at the same time, the State may not appeal the partial dismissal of a complaint while other counts remain pending in the district court. *State v. Freeman*, 234 Kan. 278, 282, 670 P.2d 1365 (1983). But Kansas law provides that the State may voluntarily dismiss any pending charges and appeal the district court's order dismissing a single count of a multiple-count complaint. *State v. Clovis*, 254 Kan. 168, 173, 864 P.2d 687 (1993).

In this case, no charges remained pending before the district court when the State's notice of appeal became effective. See *Ohlmeier v. Jones*, 51 Kan. App. 2d 1014, 1024, 360 P.3d 447 (2015) (noting that a premature notice of appeal filed after oral pronouncement of the judgment becomes effective when the journal entry is filed). As a result, our court has jurisdiction to consider the State's appeal. See *State v. Hagey*, No. 106,068, 2012 WL 3171822, at *4 (Kan. App. 2012) (unpublished opinion).

Dryden asks our court to overturn our Supreme Court's holding in *Zimmerman*. But we are duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position. *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). The Kansas Supreme Court has given no indication of departing from its long-standing precedent which allows the State to appeal from an order dismissing a single count of a multiple-count complaint. In accordance with that precedent, we find that the State may appeal the district court's order dismissing the attempted first-degree murder charge. Accordingly, we have jurisdiction to address the State's appeal.

10

*The State's Voluntary Dismissal and Dryden's Right to Due Process.*

Next, Dryden argues that our court lacks jurisdiction over the State's appeal because the voluntary dismissal of the complaint "was obtained without any notice or opportunity to be heard in violation of the defendant's constitutional rights in addition to violating the statutory requirements." Specifically, Dryden asserts the ex parte order for voluntary dismissal deprived her of due process to contest the dismissal.

"The basic elements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *State v. Robinson*, 281 Kan. 538, 548, 132 P.3d 934 (2006). When reviewing a procedural due process claim the court must first determine whether a protected liberty or property interest is involved. *Village Villa v. Kansas Health Policy Authority*, 296 Kan. 315, 331, 291 P.3d 1056 (2013). Dryden fails to inform us how the State's voluntary dismissal of the aggravated battery charge implicates a protected liberty or property interest. This failure is consequential because it is only when a protected interest is implicated that the court determines the nature and extent of the process that is due. 296 Kan. at 331.

Similarly, Dryden cites no applicable authority which requires the State to notify a defendant of its intent to voluntarily dismiss a charge or a complaint. And Dryden does not enlighten us as to why a district court must hold a hearing on the State's voluntary dismissal of a complaint. K.S.A. 22-3201(e) simply provides that the district court "may permit a complaint or information to be amended at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." Contrary to Dryden's position, K.S.A. 22-3201(e) does not require or contemplate a hearing before the State voluntarily dismisses a charge or a complaint.

Issues not adequately briefed are considered waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). Additionally, failure to support a point with

11

pertinent authority or show why it is sound despite a lack of supporting authority is akin to failing to brief the issue. *State v. Pewenofkit*, 307 Kan. 730, 731, 415 P.3d 398 (2018). Because Dryden has failed in this respect, we find the issue is waived or abandoned on appeal.

DISMISSAL OF ATTEMPTED FIRST-DEGREE MURDER CHARGE

The State contends the district court erred by failing to bind Dryden over on attempted first-degree murder. It asserts the court failed to apply proper legal standards to evaluate the evidence presented at the preliminary hearing. The State claims that, when the evidence is evaluated under the proper standards, it presented sufficient evidence to establish probable cause that Dryden premediated an attempted killing. Dryden responds that there was insufficient evidence to support the charge of attempted premediated murder.

At the outset, it is necessary to review the standards of review for both the district court and appellate courts. Under K.S.A. 2018 Supp. 22-2902(3), the magistrate examines the evidence at a preliminary hearing to determine (1) whether a crime has been committed and (2) whether there is probable cause to believe that the accused committed the crime. *State v. Washington*, 293 Kan. 732, 733, 268 P.3d 475 (2012). To bind a defendant over at a preliminary hearing, the district court must find the evidence is sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the defendant's guilt. *State v. Brown*, 299 Kan. 1021, 1030, 327 P.3d 1002 (2014).

In reviewing the evidence, the district court draws inferences in favor of the State. Moreover, the evidence need only show probable cause, not guilt beyond a reasonable doubt. Even if the evidence is weak, the defendant should be bound over for trial if the evidence tends to establish that the offense was committed and the defendant committed

12

it. *Washington*, 293 Kan. at 733-34. On appeal, our court reviews whether the evidence was sufficient to establish probable cause independently, with no required deference to the district court's conclusion. 293 Kan. at 734.

In the present case, to bind Dryden over on the attempted first-degree murder charge, the State was required to show probable cause that Dryden attempted to intentionally and with premeditation kill McTye. See K.S.A. 2018 Supp. 21-5402; PIK Crim. 4th 54.110 (2017 Supp.). The district court determined the State failed to prove the element of premeditation at the preliminary hearing.

What is premeditation? Premeditation means to have thought the matter over beforehand, forming the design or intent to kill before the act. *State v. Holmes*, 272 Kan. 491, 498-99, 33 P.3d 856 (2001); PIK Crim. 4th 54.150(d) (2016 Supp.). Premeditation does not necessarily mean an act is planned, contrived, or schemed beforehand. Instead, premeditation suggests a time of reflection or deliberation. *State v. Kettler*, 299 Kan. 448, 466, 325 P.3d 1075 (2014). Although no specific time period is required to constitute premeditation, premeditation requires more than the instantaneous, intentional act of taking another's life. PIK Crim. 4th 54.150(d) (2016 Supp.).

Of note, direct evidence is unnecessary to establish either intent or premeditation. Instead, premeditation, deliberation, and intent may be reasonably inferred from the circumstances of a case. In other words, premeditation may be proven by circumstantial evidence. *Kettler*, 299 Kan. at 466-67.

Kansas courts use five factors to determine if circumstantial evidence gives rise to an inference of premeditation: "'(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless.'" 299 Kan. at 467

(quoting *State v. Scaife*, 286 Kan. 614, 617-18, 186 P.3d 755 [2008]). The number of factors present does not determine what inference of premeditation may be drawn. In some cases a single factor may be compelling evidence of premeditation.

As our standard of review requires, we have independently reviewed the evidence presented at the preliminary hearing and applied these five factors to determine if there was probable cause to believe that Dryden premeditated killing McTye but failed in the attempt.

The first factor—the nature of the weapon used—supports an inference of premeditation. Dryden used a deadly weapon—a fully-loaded revolver and fired all five rounds at a defenseless McTye. The shooting was at close range. At the time he was shot, McTye was only six feet from Dryden. While the use of a deadly weapon does not by itself establish premeditation, *Kettler*, 299 Kan. at 467, Dryden's repeated firing of a firearm at close range is a clear indication of premeditation. See *State v. Knox*, 301 Kan. 671, 681-82, 347 P.3d 656 (2015).

Turning to the second and third factors, the undisputed evidence shows that the shooting was provoked by S.D. telling Dryden that McTye had just sexually assaulted her. However, Dryden's actions after the provocation and before shooting McTye support a probable cause finding of premeditation.

An act of violence separated from the provocation by a sufficient cooling-off time is not the product of heat of passion. *State v. Henson*, 287 Kan. 574, 583-86, 197 P.3d 456 (2008) (finding that a 20-to 30-minute period between a "sucker punch" and a shooting was "a sufficient cooling-off time for a person to regain reason"). "'With the passing of time after provocation, passion cools and gives way to reason and mastery over one's passion. An act of violence separated from the provocation by sufficient

14

cooling time is the product of malice and cold calculation rather than heat of passion.'" 287 Kan. at 583 (quoting *State v. Follin*, 263 Kan. 28, 38, 947 P.2d 8 [1997]).

In viewing the evidence in the light most favorable to the State, after S.D. told Dryden to get him out of the house, Dryden went upstairs to confront McTye. Dryden then came back downstairs and S.D. told Dryden that McTye sexually assaulted her, but did not describe the details of what occurred. After S.D. told Dryden about the sexual assault, Dryden went outside to her car and retrieved the revolver. Dryden also had the presence of mind to ask a friend to call S.D.'s father and ask him to come back to the house. Dryden then went back upstairs, found McTye undressing on the bed, and demanded that he leave the residence. After McTye responded, Dryden fired five shots at McTye.

Although S.D.'s information that McTye sexually assaulted her provoked the shooting, Dryden's actions after that revelation—and before the shooting—indicate that she had time to cool down, think the matter over beforehand, and had the presence of mind to formulate her plan which required that she go outside to her car to obtain the deadly weapon necessary to accomplish the shooting before going upstairs to the bedroom and confronting McTye. Viewed in this way, this factor favors a finding of premeditation.

Dryden correctly notes that the only evidence presented at the preliminary hearing that she went outside to retrieve the firearm came from Detective Thompson, who testified about interviews he had with S.D. shortly after the incident. While Dryden's point is accurate, there is no indication the district court discounted the truth or accuracy of the detective's testimony. S.D.'s statements were unequivocal and made while the events were recently perceived. And Johnson, the only other witness to testify regarding Dryden's movements, when pressed on cross-examination, only testified that, "I do not remember seeing [Dryden] go outside." Considering all the evidence together, while

15

drawing inferences favorable to the State, we are persuaded that this factor weighs towards a finding of premeditation.

Under the fourth factor, premeditation can also be inferred from threats and declarations made by a defendant before and during the occurrence. *Kettler*, 299 Kan. at 467. The State presented no evidence that Dryden made any declarations suggesting she intended to kill McTye. And Dryden claims her instructions for Johnson to call 911 and for Jones to check on McTye after the shooting is evidence that she lacked premeditation and intent to kill. See *State v. Hill*, 290 Kan. 339, 363, 228 P.3d 1027 (2010) (evidence that defendant did not seek medical attention for the victim circumstantially supports premeditation and intent to kill). The facts relating to this factor are ambiguous. Just because Dryden realized that she did not kill McTye does not necessarily suggest that she did not intend and premeditate to kill him. We view this factor, under the circumstances, as favoring a finding that the shooting was not premeditated.

The fifth factor relates to whether the defendant dealt lethal blows after the victim was downed and rendered helpless. Obviously, since the bullet which struck McTye was not lethal, this factor is not directly relevant. However, as discussed with regard to the first factor, there was evidence that the second bullet struck McTye and that after he was shot, Dryden continued to fire the revolver three times until all the bullets in the chamber were spent. McTye had no memory of the final three shots being fired, leaving the inference that he was helpless during this time. The repeated firing of Dryden's revolver at close range—especially after McTye was wounded—suggests a purposefulness that is consistent with a premeditated act.

In conclusion, having applied the five factors that give rise to an inference of premeditation, viewed in a light most favorable to the State, there was sufficient evidence to establish probable cause to believe that Dryden committed attempted first-degree premeditated murder. Despite provocation, Dryden's actions of leaving the residence,

16

going to her vehicle to obtain a revolver, seeking out McTye upstairs to confront him with the deadly weapon, and firing five shots at him tends to establish premeditation. See *State v. Clemons*, 273 Kan. 328, 335, 45 P.3d 384 (2002) (evidence that the defendant chased one victim and waited outside a store for another supported a finding of premeditation); *State v. Jamison*, 269 Kan. 564, 572, 7 P.3d 1204 (2000) (pursuit of victim with gun is evidence of premeditation).

In our review of the State's appeal, we are required to review the evidence de novo and place ourselves in the same position as the district court. *State v. Berg*, 270 Kan. 237, 238, 13 P.3d 914 (2000). The district court "must draw inferences favorable to the prosecution from the evidence presented at the preliminary examination." 270 Kan. 237, Syl. ¶ 2. In accordance with our standard of review and our consideration of all the evidence presented, we find the district court erred in failing to bind Dryden over for arraignment and trial on the charge of attempted first-degree premeditated murder.

Reversed and remanded with directions to reinstate the criminal complaint charging Dryden with attempted first-degree premeditated murder and to bind over the defendant on the charge for arraignment and further proceedings.